UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

BEIERSDORF, INC.; BRISTOL-MYERS SQUIBB COMPANY; COMMONWEALTH BRANDS, INC.; ENERGIZER BATTERY, INC.; ENERGIZER HOLDINGS, INC.; GENERAL MILLS, INC.; GEORGIA-PACIFIC CONSUMER PRODUCTS LP; DIXIE CONSUMER PRODUCTS LLC; HORMEL FOODS CORPORATION; THE J.M. SMUCKER COMPANY; JOHNSON & JOHNSON; KELLOGG COMPANY; KIMBERLY-CLARK GLOBAL SALES, INC.; KRAFT FOODS GLOBAL, INC.; LAND O'LAKES, INC.; LORILLARD TOBACCO COMPANY; McCORMICK & COMPANY, INCORPORATED; NESTLÉ USA, INC.; NESTLÉ PURINA PETCARE COMPANY; PEPSICO, INC.; THE PROCTER & GAMBLE DISTRIBUTING LLC; S.C. JOHNSON & SON, INC.; and CONOPCO, INC. DBA UNILEVER,

Plaintiffs,

v.

INTERNATIONAL OUTSOURCING SERVICES, LLC; THOMAS C. BALSIGER; BRUCE A. FURR; STEVEN A. FURR; LANCE A. FURR; WILLIAM L. BABLER; OVIDIO H. ENRIQUEZ; DAVID J. HOWARD; JAMES C. CURREY; and HOWARD R. MCKAY,

Defendants.

Civil Action No. ____________

**COMPLAINT**

1. This is an action for violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq. ("RICO"), as well as common law fraud, failure to disclose, and unjust enrichment. Defendants International Outsourcing Services, LLC ("IOS"),

Thomas C. Balsiger, Bruce A. Furr, Steven A. Furr, Lance A. Furr, William L. Babler, Ovidio H. Enriquez, David J. Howard, James C. Currey, and Howard R. McKay (collectively "Defendants") engaged in an enterprise whereby they conspired to defraud -- and did defraud -- consumer product manufacturers of hundreds of millions of dollars. Pursuant to their scheme, Defendants knowingly induced Plaintiffs to pay IOS for manufacturers' "cents off" coupons that Defendants knew had not been redeemed in connection with a consumer purchase or otherwise had not been redeemed as represented by IOS. IOS submitted fraudulent invoices to Plaintiffs or their authorized agents and received payments pursuant to those fraudulent invoices. Defendants concealed their scheme over a number of years. On March 6, 2007, a grand jury in this District indicted IOS and the other Defendants, charging that Defendants stole more than $250 million pursuant to their scheme.[1]

**THE PARTIES**

2. Beiersdorf, Inc. ("Beiersdorf") is a Delaware corporation with its principal place of business in Wilton, Connecticut. Beiersdorf issues "cents-off" coupons for redemption by the consuming public in conjunction with the purchase of products it manufactures.

3. Bristol-Myers Squibb Company ("Bristol-Myers Squibb") is a Delaware corporation with its principal place of business in New York, New York. Bristol-Myers Squibb, including its wholly-owned subsidiary Mead Johnson & Company, issues "cents-off" coupons for redemption by the consuming public in conjunction with the purchase of products it manufactures.

4. Commonwealth Brands, Inc. ("Commonwealth Brands") is a Kentucky corporation with its principal place of business in Bowling Green, Kentucky. Commonwealth

---

[1] Since that time, pursuant to a cooperation agreement negotiated with the prosecutors, IOS has been dismissed from the indictment, but criminal charges against all other Defendants remain pending.

issues "cents-off" coupons for redemption by the consuming public in conjunction with the purchase of products it manufactures.

5.    Energizer Battery, Inc. is a Delaware corporation with its principal place of business in St. Louis, Missouri and Energizer Holdings, Inc. is a Missouri corporation with its principal place of business in St. Louis, Missouri. Energizer Battery and Energizer Holdings are referred to herein collectively as "Energizer." Energizer issues "cents-off" coupons for redemption by the consuming public in conjunction with the purchase of products it manufactures. In addition, in 2003 Energizer acquired the Schick shaving business. Also, on October 1, 2007, Playtex Products, Inc. was merged into a subsidiary of Energizer Holdings and became a wholly-owned subsidiary of Energizer Holdings. Finally, Eveready Battery Company, Inc. is a subsidiary of Energizer Holdings that was financially responsible for coupon redemptions prior to 2003. Accordingly, Energizer asserts the rights and claims of Schick, Playtex and Eveready as well.

6.    General Mills, Inc. ("General Mills") is a Delaware corporation with its principal place of business in Minneapolis, Minnesota. General Mills issues "cents-off" coupons for redemption by the consuming public in conjunction with the purchase of products it manufactures. In addition, in 2001, General Mills acquired The Pillsbury Company; accordingly, General Mills asserts the rights and claims of The Pillsbury Company as well.

7.    Georgia-Pacific Consumer Products LP is a Delaware limited partnership and Dixie Consumer Products LLC is a Delaware limited liability company, both with their principal place of business in Atlanta, Georgia (collectively "Georgia-Pacific") and both collectively asserting rights on behalf of the following former entities: Georgia-Pacific Corporation, Fort James Operating Company, Fort James Corporation, Fort Howard Corporation and James River

Corporation. Georgia-Pacific issues "cents-off" coupons for redemption by the consuming public in conjunction with the purchase of products it manufactures.

8. Hormel Foods Corporation ("Hormel") is a Delaware corporation with its principal place of business in Austin, Minnesota. Hormel issues "cents-off" coupons for redemption by the consuming public in conjunction with the purchase of products it manufactures.

9. The J. M. Smucker Company ("J. M. Smucker") is an Ohio corporation with its principal place of business in Orrville, Ohio. J.M. Smucker issues "cents-off" coupons for redemption by the consuming public in conjunction with the purchase of products it manufactures. In addition, J.M. Smucker acquired International Multifoods Corporation in June 2004 and acquired Eagle Family Foods Holdings, Inc. and related entities in May 2007; accordingly, J.M. Smucker asserts the rights and claims of those entities as well.

10. Johnson & Johnson ("J&J") is a New Jersey corporation with its principal place of business in New Brunswick, New Jersey. J&J issues "cents-off" coupons for redemption by the consuming public in conjunction with the purchase of products it manufactures.

11. Kellogg Company ("Kellogg") is a Delaware corporation with its principal place of business in Battle Creek, Michigan. Kellogg issues "cents-off" coupons for redemption by the consuming public in conjunction with the purchase of products it manufacturers. In addition, Kellogg acquired Keebler Foods Company in 2001; accordingly, Kellogg asserts the rights and claims of Keebler as well.

12. Kimberly-Clark Global Sales, Inc. ("Kimberly-Clark") is a Delaware corporation with its principal place of business in Neenah, Wisconsin. Kimberly-Clark issues "cents-off"

coupons for redemption by the consuming public in conjunction with the purchase of products it manufactures.

13.   Kraft Foods Global, Inc. ("Kraft Foods") is a Delaware corporation with its principal place of business in Northfield, Illinois. Kraft Foods issues "cents-off" coupons for redemption by the consuming public in conjunction with the purchase of products it manufactures.

14.   Land O'Lakes, Inc. ("Land O'Lakes") is a Minnesota cooperative corporation with its principal place of business in Arden Hills, Minnesota. Land O'Lakes issues "cents-off" coupons for redemption by the consuming public in conjunction with the purchase of products it manufactures.

15.   Lorillard Tobacco Company ("Lorillard") is a Delaware corporation with its principal place of business in Greensboro, North Carolina. Lorillard issues "cents-off" coupons for redemption by the consuming public in conjunction with the purchase of products it manufactures.

16.   McCormick & Company, Incorporated ("McCormick") is a Maryland corporation with its principal place of business in Sparks, Maryland. McCormick issues "cents-off" coupons for redemption by the consuming public in conjunction with the purchase of products it manufactures. In addition, Zatarain's Brands, Inc. is a wholly owned subsidiary of McCormick; accordingly, McCormick asserts the rights and claims of Zatarain's as well.

17.   Nestlé USA, Inc. ("Nestlé") is a Delaware corporation with its principal place of business in Glendale, California. Nestlé issues "cents-off" coupons for redemption by the consuming public in conjunction with the purchase of products it manufactures.

18. Nestlé Purina PetCare Company ("Nestlé Purina") is a Missouri corporation with its principal place of business in St. Louis, Missouri. Nestlé Purina issues "cents-off" coupons for redemption by the consuming public in conjunction with the purchase of products it manufactures.

19. PepsiCo, Inc. ("PepsiCo") is a North Carolina corporation with its principal place of business in Purchase, New York. PepsiCo, through its subsidiaries including but not limited to The Quaker Oats Company, Frito-Lay, Inc., Pepsi Cola North America and Tropicana Products, Inc., issues "cents-off" coupons for redemption by the consuming public in conjunction with the purchase of products it manufactures.

20. The Procter & Gamble Distributing LLC (formerly The Procter & Gamble Distributing Company before a name change on October 1, 2006) ("P&G") is a Delaware limited liability company with its principal place of business in Cincinnati, Ohio. P&G issues "cents-off" coupons for redemption by the consuming public in conjunction with the purchase of products it manufacturers. In addition, P&G acquired The Gillette Company in 2005; accordingly, P&G asserts the rights and claims of Gillette as well.

21. S.C. Johnson & Son, Inc. ("S.C. Johnson") is a Wisconsin corporation with its principal place of business in Racine, Wisconsin. S.C. Johnson issues "cents-off" coupons for redemption by the consuming public in conjunction with the purchase of products it manufactures.

22. Conopco, Inc. dba Unilever is a New York corporation with its principal place of business in Englewood Cliffs, New Jersey. Unilever and its divisions, including but not limited to its ice cream division operating in Green Bay, Wisconsin, issue "cents-off" coupons for

redemption by the consuming public in conjunction with the purchase of products they manufacture.

23.     Defendant International Outsourcing Services, LLC is an Indiana limited liability company with principal offices in El Paso, Texas and Bloomington, Indiana. IOS acts as a clearinghouse in the coupon redemption process, receiving coupons from numerous retailer clients, processing the coupons and then forwarding them to the pertinent manufacturer (or manufacturer's redemption agent) for reimbursement.

24.     During the period pertinent to this Complaint, Defendant Thomas C. ("Chris") Balsiger was IOS's Chief Operating Officer, President and, later, Chief Executive Officer. Balsiger is a resident of Texas.

25.     During the period pertinent to this Complaint, Defendant Bruce A. Furr was the Chairman of IOS's Board. Bruce Furr also had been IOS's Chief Executive Officer. Bruce Furr is a resident of Indiana.

26.     During the period pertinent to this Complaint, Defendant Lance A. Furr was an IOS Executive Vice President and Board member. Lance Furr also was IOS's Chief Financial Officer until 2004. Lance Furr is a resident of Indiana.

27.     During the period pertinent to this Complaint, Defendant Steven A. Furr was an IOS Executive Vice President, Board member and, later, President of IOS's North American Operations. Steven Furr is a resident of Texas.

28.     During the period pertinent to this Complaint, Defendant William L. Babler was IOS's Chief Financial Officer. Babler is a resident of Indiana.

29. During the period pertinent to this Complaint, Defendant Howard R. McKay was an IOS consultant and sales manager and served on IOS's Advisory Board. McKay is a resident of Tennessee.

30. During the period pertinent to this Complaint, Defendant Ovidio H. Enriquez was an IOS plant manager, working in El Paso, Texas, and Juarez, Mexico. Enriquez was also a Vice President and General Manager for IOS. Enriquez is a resident of Texas.

31. During the period pertinent to this Complaint, Defendant David J. Howard was an IOS plant manager, working in Del Rio, Texas and Acuna, Mexico. Howard was also a Vice President and General Manager for IOS. Howard is a resident of Texas.

32. During the period pertinent to this Complaint, Defendant James C. Currey was the President of Currey, Adkins, a firm that handled information technology for IOS, and was on IOS's Advisory Board. Currey is a resident of Texas.

## JURISDICTION AND VENUE

33. Jurisdiction is proper in this Court pursuant to 18 U.S.C. § 1964(a) and (c), and 28 U.S.C. §§ 1331 and 1332. With respect to Plaintiffs' common law claims, this Court also has jurisdiction pursuant to 28 U.S.C. § 1367. With respect to 28 U.S.C. § 1332, Plaintiffs and Defendants are citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

34. Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b) and 18 U.S.C. § 1965(a) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## FACTS

**The Coupon Industry**

35. Plaintiffs are manufacturers of a vast array of consumer products, ranging from food and beverages, to health and beauty products, to paper products, to cleansers and detergents. These companies issue "cents off" coupons that consumers can redeem in connection with the purchase of the companies' products at grocery and other retail stores.

36. The cents off coupons issued by Plaintiffs and other manufacturers are distributed on a regular basis. The principal means of distribution are via "inserts" in local newspapers (i.e., the advertising pamphlets inserted in newspapers, usually on Sunday, that include coupons) and via advertising circulars; there are other methods of distribution as well, including direct mail, on or in product packages, at the point of sale when particular products are purchased, etc. Consumers exchange the coupons for a discount when they purchase the manufacturers' products. In order to use a coupon, a consumer presents the coupon to the grocery store or retail cashier at the time the product identified on the coupon is purchased. Pursuant to the offer stated on the coupon, there may be volume (e.g., $1.00 off three packages) or other requirements that must be satisfied. The cashier then deducts the coupon's stated face value from the product's purchase price. The retail merchant retains the coupon following the transaction.

37. Following the retail sale, the next steps in the redemption process involve the reimbursement of the retailer by the manufacturer issuing the coupon. After a coupon is received from a consumer, the retailer must submit the coupon to the appropriate manufacturer or its agent, which then pays the face value of the coupon plus a handling fee to the retailer.

38. Typically, retailers do not submit coupons directly to manufacturers or the manufacturers' agents, but instead rely on intermediary companies to act as the retailer's agent in

this process. The companies that perform this service are usually referred to as coupon processors or coupon clearinghouses (both referred to hereafter as "clearinghouses").

39. Retailers normally ship their coupons to a clearinghouse, which then sorts the coupons according to the issuing manufacturer and counts them. The clearinghouse then submits invoices for the value of the coupons and the handling fee, usually along with the coupons themselves, to the various manufacturers or their designated agents for payment in accordance with the terms and conditions of the individual manufacturers' respective coupon redemption policies. The clearinghouse then receives the payments, often in the name of the retailer client, from the manufacturers. The clearinghouse forwards the payment to the retailer, less a charge for the clearinghouse's services. While the foregoing is a general description of the overall redemption process, there may be a number of variations on this process. For purposes here, the most significant variation is that in some instances a retailer so completely "outsources" the redemption function to the clearinghouse that the clearinghouse has the ability not only to submit coupons and receive payments in the retailer's name, but also to negotiate adjustments and issue payments ostensibly on behalf of the retailer, without any oversight by or transparency to the retailer. Also, in some instances, a retailer will accept a payment from a clearinghouse upon the submission of coupons to the clearinghouse in return for divesting any further interest in the coupons, thereby giving the clearinghouse total control over those coupons and their disposition.

**<u>The Defendants' Scheme</u>**

40. IOS is the largest coupon clearinghouse for retailers. IOS and its predecessors have been in business since 1961. Over the years, IOS has processed hundreds of millions of coupons annually on behalf of major retailers such as Kroger, Food Lion, Pathmark, Winn-Dixie, HEB, Hannaford Brothers, Kash 'n Karry, CVS, Rite Aid, BJ's Wholesale and Fresh

Brands/Piggly Wiggly. IOS receives coupons from all over the United States and Canada, arriving via the U.S. Postal Service, courier services, air freight and commercial truck lines.

41. Although the Defendants' scheme was multi-faceted, at its most fundamental level it involved simply augmenting the substantial volumes of properly-redeemed coupons that IOS received from certain of its major retailer clients with other coupons that IOS acquired, and then fraudulently submitting the entire batch as if all of the coupons had been redeemed legitimately by consumers at the designated retailer. Thus, for example, if IOS received 100 coupons from Retailer X that had been issued by Manufacturer A, IOS would add additional coupons from Manufacturer A to this batch without the knowledge of Retailer X (for illustrative purposes, say, 20) and then submit all 120 coupons to Manufacturer A; IOS would invoice Manufacturer A for all 120 coupons as if all 120 had been redeemed at Retailer X. In this way, Defendants used IOS's legitimate coupon business as a cover for their scheme. Defendants knowingly devised and participated in this scheme to defraud and to obtain money by means of false pretenses and representations and did so with the intent to defraud Plaintiffs.

42. Through this scheme, Defendants induced manufacturers, including Plaintiffs, to pay hundreds of millions of dollars pursuant to invoices that Defendants knew to be fraudulent. The coupons utilized by Defendants to effectuate their scheme included coupons that never had been redeemed by any consumer in connection with any retail purchase and coupons that IOS falsely invoiced to manufacturers as having been redeemed at a particular retail store when, in fact, those coupons had been submitted to IOS from a different store, in many instances through "coupon brokers"; in the latter case, the coupons likely had not been redeemed by a consumer and, in any event, as Defendants knew, the identification of the store at which they were nominally redeemed would prompt far greater scrutiny of the coupons (for example, due to

questions involving purported coupon volume as a percentage of total sales, coupon volume compared to product volume, past redemption practices, etc.). These coupons utilized to effectuate the scheme are sometimes referred to hereinafter as "illegitimate coupons." IOS's submission of coupons to Plaintiffs or their agents for reimbursement and the accompanying invoices explicitly and implicitly represented that the coupons had been redeemed in connection with a retail purchase at the identified retailer, which was false, as Defendants knew.

43.    Within IOS, Defendants referred to the scheme to defraud using terms such as "alternative invoicing," "alternative manufacturing invoicing," "8's and 9's" (referring to invoice sequences), "deuces," "error trays," "indirect revenue," "trickling," and "arbitrage."

44.    In order to carry out the scheme, Defendants acted through an enterprise comprised of Defendants and various associates, including "coupon brokers" and other third parties.

45.    Defendants solicited the coupon brokers (including, among others, Abdel Rahim Jebara and Daxesh V. Patel and Bharatkumar K. Patel of Riya Coupon Services, LLC, each of whom has now been indicted for coupon fraud) to acquire as many coupons as they could (either directly or through other third parties) for IOS to include in submissions to manufacturers, knowing that many of the coupons so acquired had never been redeemed in connection with a retail purchase. Defendants, themselves and through the coupon brokers, directed third parties to procure coupon inserts for mass cutting and otherwise to procure coupons for use in the scheme.

46.    In some instances, Defendants obtained mass cut and other coupons directly from those coordinating the procurement and cutting. In other cases, the coupon brokers signed up small retailers as direct or indirect IOS clients and submitted mass cut and other illegitimate coupons to IOS as coupons supposedly redeemed at these small retail establishments.

Defendants, directly and through direction of IOS employees, worked with the brokers to set up and accept large coupon submissions from these retail accounts as a cover for their infusion of illegitimate coupons into the coupon redemption process. Indeed, the volume of coupons being submitted by these retail accounts was well in excess of the amount that these accounts could have submitted legitimately. Defendants then co-mingled these illegitimate coupons with legitimate coupon submissions made by certain of IOS's larger retail accounts before submitting them to Plaintiffs or their agents for reimbursement.

47.     Defendant Balsiger set periodic goals for the volume of illegitimate coupons to be included by IOS with shipments from large retailers and directed others, including Defendants Enriquez and Howard, to ensure that these goals were met by the brokers and others.

48.     According to a criminal indictment by the United States concerning this same scheme, "[a]s a result of their scheme, the defendants wrongfully obtained . . . over $250 million from manufacturers nationwide" for the period "[b]eginning by 1997 and continuing through December 2006." Indictment, ¶¶ 1-2, Case No. 07-CR-057 (E.D. Wisc. Mar. 6, 2007). Assuming a normal distribution of brands and products among the fraudulent submissions, the vast majority of this $250 million was wrongfully obtained from Plaintiffs.

49.     Retailers whose legitimate coupon submissions were augmented and used by Defendants for fraudulent invoices and submissions to manufacturers included Food Lion, Winn-Dixie, Pathmark, Kash n' Karry, Hannaford Brothers, HEB, Rite Aid, CVS, BJ's Wholesale and Fresh Brands/Piggly Wiggly. Defendants made fraudulent submissions and presented fraudulent invoices to manufacturers pursuant to this scheme beginning by 1997 and continuing through 2006.

50.     Pursuant to Defendants' scheme, IOS repeatedly submitted fraudulent invoices to each of the Plaintiffs (or their agents) for coupons supposedly redeemed by consumers at Food Lion stores when, in fact, as Defendants knew, some or all of the coupons had not been redeemed by any consumer and/or had not been submitted to IOS by Food Lion. Without knowing the true status of the coupons or the fraudulent nature of the submissions and invoices, and relying on the invoices to be truthful representations that the coupons had been redeemed by consumers at Food Lion stores and of the amounts owed for such coupons, Plaintiffs paid these invoices. For the purpose of executing and carrying out this scheme to defraud, Defendants used the United States mails and/or private or commercial interstate carriers and used interstate wire communications or Defendants caused the use of the United States mails and/or private or commercial interstate carriers and interstate wire communications. Because they were part and parcel of this overall scheme to defraud, each use of the mails and/or interstate carriers and each use of interstate wire communications, including each submission of each fraudulent invoice to any Plaintiff, constituted a separate act of mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, respectively.

51.     Pursuant to Defendants' scheme, IOS repeatedly submitted fraudulent invoices to each of the Plaintiffs (or their agents) for coupons supposedly redeemed by consumers at Winn-Dixie stores when, in fact, as Defendants knew, some or all of the coupons had not been redeemed by any consumer and/or had not been submitted to IOS by Winn-Dixie. Without knowing the true status of the coupons or the fraudulent nature of the submissions and invoices, and relying on the invoices to be truthful representations that the coupons had been redeemed by consumers at Winn-Dixie stores and of the amounts owed for such coupons, Plaintiffs paid these invoices. For the purpose of executing and carrying out this scheme to defraud, Defendants used

the United States mails and/or private or commercial interstate carriers and used interstate wire communications or Defendants caused the use of the United States mails and/or private or commercial interstate carriers and interstate wire communications. Because they were part and parcel of this overall scheme to defraud, each use of the mails and/or interstate carriers and each use of interstate wire communications, including each submission of each fraudulent invoice to any Plaintiff, constituted a separate act of mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, respectively.

52. Pursuant to Defendants' scheme, IOS repeatedly submitted fraudulent invoices to each of the Plaintiffs (or their agents) for coupons supposedly redeemed by consumers at HEB stores when, in fact, as Defendants knew, some or all of the coupons had not been redeemed by any consumer and/or had not been submitted to IOS by HEB. Without knowing the true status of the coupons or the fraudulent nature of the submissions and invoices, and relying on the invoices to be truthful representations that the coupons had been redeemed by consumers at HEB stores and of the amounts owed for such coupons, Plaintiffs paid these invoices. For the purpose of executing and carrying out this scheme to defraud, Defendants used the United States mails and/or private or commercial interstate carriers and used interstate wire communications or Defendants caused the use of the United States mails and/or private or commercial interstate carriers and interstate wire communications. Because they were part and parcel of this overall scheme to defraud, each use of the mails and/or interstate carriers and each use of interstate wire communications, including each submission of each fraudulent invoice to any Plaintiff, constituted a separate act of mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, respectively.

53.     Pursuant to Defendants' scheme, IOS repeatedly submitted fraudulent invoices to each of the Plaintiffs (or their agents) for coupons supposedly redeemed by consumers at Pathmark stores when, in fact, as Defendants knew, some or all of the coupons had not been redeemed by any consumer and/or had not been submitted to IOS by Pathmark.  Without knowing the true status of the coupons or the fraudulent nature of the submissions and invoices, and relying on the invoices to be truthful representations that the coupons had been redeemed by consumers at Pathmark stores and of the amounts owed for such coupons, Plaintiffs paid these invoices.  For the purpose of executing and carrying out this scheme to defraud, Defendants used the United States mails and/or private or commercial interstate carriers and used interstate wire communications or Defendants caused the use of the United States mails and/or private or commercial interstate carriers and interstate wire communications.  Because they were part and parcel of this overall scheme to defraud, each use of the mails and/or interstate carriers and each use of interstate wire communications, including each submission of each fraudulent invoice to any Plaintiff, constituted a separate act of mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, respectively.

54.     Pursuant to Defendants' scheme, IOS repeatedly submitted fraudulent invoices to each of the Plaintiffs (or their agents) for coupons supposedly redeemed by consumers at Hannaford Brothers stores when, in fact, as Defendants knew, some or all of the coupons had not been redeemed by any consumer and/or had not been submitted to IOS by Hannaford Brothers. Without knowing the true status of the coupons or the fraudulent nature of the submissions and invoices, and relying on the invoices to be truthful representations that the coupons had been redeemed by consumers at Hannaford Brothers stores and of the amounts owed for such coupons, Plaintiffs paid these invoices.  For the purpose of executing and carrying out this

scheme to defraud, Defendants used the United States mails and/or private or commercial interstate carriers and used interstate wire communications or Defendants caused the use of the United States mails and/or private or commercial interstate carriers and interstate wire communications. Because they were part and parcel of this overall scheme to defraud, each use of the mails and/or interstate carriers and each use of interstate wire communications, including each submission of each fraudulent invoice to any Plaintiff, constituted a separate act of mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, respectively.

55.     Pursuant to Defendants' scheme, IOS repeatedly submitted fraudulent invoices to each of the Plaintiffs (or their agents) for coupons supposedly redeemed by consumers at Kash 'n Karry stores when, in fact, as Defendants knew, some or all of the coupons had not been redeemed by any consumer and/or had not been submitted to IOS by Kash 'n Karry. Without knowing the true status of the coupons or the fraudulent nature of the submissions and invoices, and relying on the invoices to be truthful representations that the coupons had been redeemed by consumers at Kash 'n Karry stores and of the amounts owed for such coupons, Plaintiffs paid these invoices. For the purpose of executing and carrying out this scheme to defraud, Defendants used the United States mails and/or private or commercial interstate carriers and used interstate wire communications or Defendants caused the use of the United States mails and/or private or commercial interstate carriers and interstate wire communications. Because they were part and parcel of this overall scheme to defraud, each use of the mails and/or interstate carriers and each use of interstate wire communications, including each submission of each fraudulent invoice to any Plaintiff, constituted a separate act of mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, respectively.

56.     Pursuant to Defendants' scheme, IOS repeatedly submitted fraudulent invoices to each of the Plaintiffs (or their agents) for coupons supposedly redeemed by consumers at CVS stores when, in fact, as Defendants knew, some or all of the coupons had not been redeemed by any consumer and/or had not been submitted to IOS by CVS. Without knowing the true status of the coupons or the fraudulent nature of the submissions and invoices, and relying on the invoices to be truthful representations that the coupons had been redeemed by consumers at CVS stores and of the amounts owed for such coupons, Plaintiffs paid these invoices. For the purpose of executing and carrying out this scheme to defraud, Defendants used the United States mails and/or private or commercial interstate carriers and used interstate wire communications or Defendants caused the use of the United States mails and/or private or commercial interstate carriers and interstate wire communications. Because they were part and parcel of this overall scheme to defraud, each use of the mails and/or interstate carriers and each use of interstate wire communications, including each submission of each fraudulent invoice to any Plaintiff, constituted a separate act of mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, respectively.

57.     Pursuant to Defendants' scheme, IOS repeatedly submitted fraudulent invoices to each of the Plaintiffs (or their agents) (except for Land O'Lakes) for coupons supposedly redeemed by consumers at Rite Aid stores when, in fact, as Defendants knew, some or all of the coupons had not been redeemed by any consumer and/or had not been submitted to IOS by Rite Aid. Without knowing the true status of the coupons or the fraudulent nature of the submissions and invoices, and relying on the invoices to be truthful representations that the coupons had been redeemed by consumers at Rite Aid stores and of the amounts owed for such coupons, Plaintiffs paid these invoices. For the purpose of executing and carrying out this scheme to defraud,

Defendants used the United States mails and/or private or commercial interstate carriers and used interstate wire communications or Defendants caused the use of the United States mails and/or private or commercial interstate carriers and interstate wire communications. Because they were part and parcel of this overall scheme to defraud, each use of the mails and/or interstate carriers and each use of interstate wire communications, including each submission of each fraudulent invoice to any Plaintiff, constituted a separate act of mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, respectively.

58.     Pursuant to Defendants' scheme, IOS repeatedly submitted fraudulent invoices to each of the Plaintiffs (or their agents) for coupons supposedly redeemed by consumers at BJ's Wholesale stores when, in fact, as Defendants knew, some or all of the coupons had not been redeemed by any consumer and/or had not been submitted to IOS by BJ's Wholesale. Without knowing the true status of the coupons or the fraudulent nature of the submissions and invoices, and relying on the invoices to be truthful representations that the coupons had been redeemed by consumers at BJ's Wholesale stores and of the amounts owed for such coupons, Plaintiffs paid these invoices. For the purpose of executing and carrying out this scheme to defraud, Defendants used the United States mails and/or private or commercial interstate carriers and used interstate wire communications or Defendants caused the use of the United States mails and/or private or commercial interstate carriers and interstate wire communications. Because they were part and parcel of this overall scheme to defraud, each use of the mails and/or interstate carriers and each use of interstate wire communications, including each submission of each fraudulent invoice to any Plaintiff, constituted a separate act of mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, respectively.

59.     Pursuant to Defendants' scheme, IOS repeatedly submitted fraudulent invoices to each of the Plaintiffs (or their agents) for coupons supposedly redeemed by consumers at Fresh Brands/Piggly Wiggly stores when, in fact, as Defendants knew, some or all of the coupons had not been redeemed by any consumer and/or had not been submitted to IOS by Fresh Brands/Piggly Wiggly. Without knowing the true status of the coupons or the fraudulent nature of the submissions and invoices, and relying on the invoices to be truthful representations that the coupons had been redeemed by consumers at Fresh Brands/Piggly Wiggly stores and of the amounts owed for such coupons, Plaintiffs paid these invoices. For the purpose of executing and carrying out this scheme to defraud, Defendants used the United States mails and/or private or commercial interstate carriers and used interstate wire communications or Defendants caused the use of the United States mails and/or private or commercial interstate carriers and interstate wire communications. Because they were part and parcel of this overall scheme to defraud, each use of the mails and/or interstate carriers and each use of interstate wire communications, including each submission of each fraudulent invoice to any Plaintiff, constituted a separate act of mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, respectively.

60.     Especially given the huge volume of properly-redeemed coupons coming from the major retailers identified above that were utilized by Defendants for their scheme, there was no reasonable way to detect or identify the addition of even very large numbers of illegitimate coupons to the stream of legitimate coupons. Now that the nature of the scheme has been revealed, however, a number of examples even more specific than those set forth above are identifiable with the benefit of hindsight. These examples highlight the fraud. Several of these examples are set forth below.

A. IOS submitted invoices to Good Humor-Breyers Ice Cream, a division of Unilever, in 2002 that included requests for payment for coupons for Klondike®, Popsicle®, and Breyers® ice cream products under offer codes 40298, 62252, 62228, 40263, 55949, 40233, 62252, and 55896, representing that these coupons had been redeemed at HEB stores in Texas. Such coupons had been distributed only in the northeastern United States and had never been distributed in Texas. The coupons had not been redeemed at HEB stores in Texas, as IOS represented. The charges in IOS's fraudulent invoices were passed along to Good Humor-Breyers in the contemporaneous invoices by its agent set forth below:

| Date | Invoice No. | Amount |
|---|---|---|
| 4/01/02 | 02-05285-00 | $352,873.88 |
| 5/20/02 | 02-08282-00 | $525,503.88 |
| 8/19/02 | 02-13837-00 | $605,120.07 |
| 10/21/02 | 02-17495-00 | $247,386.54 |
| 10/28/02 | 02-17892-00 | $234,631.64 |

B. IOS submitted invoices to Kimberly-Clark in 2002 that included requests for payment for coupons for Kotex® products under offer codes 42509, 42510, 42511, 42607, 42618, 42620, 42621, and 42622, representing that these coupons had been redeemed at HEB stores in Texas. Such coupons were distributed only in the northeastern United States and were never distributed in Texas. The coupons had not been redeemed at HEB stores in Texas, as IOS represented. The charges in IOS's fraudulent invoices were passed along to Kimberly-Clark in the contemporaneous invoices by its agent set forth below:

| Date | Invoice No. | Amount |
|---|---|---|
| 6/24/02 | 02-10458-00 | $3,020,744.36 |
| 7/01/02 | 02-10878-00 | $3,391,755.28 |
| 7/08/02 | 02-11382-00 | $2,964,381.51 |
| 8/19/02 | 02-13826-00 | $3,363,712.80 |
| 10/21/02 | 02-17486-00 | $2,913,282.42 |

C. IOS submitted invoices to S.C. Johnson in late 2002 and early 2003 that included requests for payment for coupons for S.C. Johnson's Scrubbing Bubbles®, Shout®, and/or Oxy Power® products under redemption codes 26291 and 26292, representing that these coupons had been redeemed at Food Lion stores in the southeastern United States and HEB stores in Texas. Such coupons were distributed only in the northeastern United States and were never distributed in the southeastern United States or in Texas. The coupons had not been redeemed at the Food Lion or HEB stores, as IOS represented. The charges in IOS's fraudulent invoices were passed along to S.C. Johnson by its agent and were included for ultimate payment to IOS in the electronic transfers from S.C. Johnson to its agent set forth below:

| Date | Invoice No. | Amount |
|---|---|---|
| 11/29/02 | 021129001172 | $1,072,695.49 |
| 12/06/02 | 021206001172 | $2,188,752.53 |
| 1/17/03 | 030117001172 | $1,683,441.89 |
| 2/07/03 | 030207001172 | $1,016,194.07 |
| 2/14/03 | 030214001172 | $ 953,959.76 |

D. Over a three year period from 2001-2003, IOS submitted invoices to McCormick that included requests for payment for seventy thousand coupons supposedly redeemed by consumers at HEB stores in Texas, when those coupons had been distributed only

in regions of the United States distant from Texas and that had never been distributed in Texas. Such coupons had not been redeemed at the HEB stores in Texas, as IOS represented.

E. In 2002, IOS submitted fraudulent invoices to Hormel for coupons supposedly redeemed at Kroger, HEB, Kash 'n Karry, Rite Aid, Publix Supermarkets, Food Lion, and Winn Dixie stores and including requests for payment for coupons for Hormel's CARAPELLI® Olive Oil product. In addition, during this same period, IOS submitted invoices to Hormel for coupons supposedly redeemed at CVS stores and including requests for payment for coupons for Hormel's CARAPELLI® Olive Oil, SPAM® and JENNIE-O TURKEY STORE® products. For all of these coupons, either the coupons had never been distributed in the geographic markets in which they were supposedly redeemed or the products for which the coupons were supposedly redeemed were not carried by the retailer that IOS identified as submitting the coupons. These coupons had not been redeemed at the indicated stores, as IOS represented.

* * *

All of the invoices submitted to the indicated Plaintiffs in these examples were fraudulent and were submitted pursuant to Defendants' scheme. For the purpose of executing and carrying out their scheme to defraud, Defendants used the United States mails and/or private or commercial interstate carriers and used interstate wire communications or Defendants caused the use of the United States mails and/or private or commercial interstate carriers and interstate wire communications. Because they were part and parcel of this overall scheme to defraud, each use of the mails and/or interstate carriers and each use of interstate wire communications, including each submission of each IOS invoice identified above, constituted a separate act of mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, respectively.

**Defendants' Concealment of Their Scheme**

61.     Defendants went to great lengths to conceal their scheme to defraud Plaintiffs, including sending letters of explanation for certain perceived redemption anomalies, distancing themselves from other participants in the enterprise who were indicted for coupon fraud earlier, and even inviting certain retailers and manufacturers to tour IOS's facilities to attempt to convince them that all was in order. Defendants also used intimidation, firing of employees, and public statements and promises to conceal their scheme.

62.     For example, in 2003, an IOS employee, Robert MacDonald, who was based in Memphis, was indicted for coupon fraud along with Abdel Rahim Jebara and others. MacDonald had been working with Jebara and another coupon broker to obtain illegitimate coupons from mass cutting operations. The mass-cut coupons were then submitted to IOS via small retail accounts that Jebara and the other coupon broker had solicited and set up as IOS clients through MacDonald. Jebara and the other coupon broker then submitted illegitimate coupons through these accounts. As the manager of the accounts, MacDonald arranged for these submissions to be accepted and, in turn, submitted to manufacturers for reimbursement (either directly or through co-mingling with legitimate submissions from large retailers). As the public and manufacturers became aware of the criminal allegations concerning MacDonald pursuant to his indictment, IOS issued a statement suggesting that MacDonald was a mid-level employee and an isolated actor, and that IOS itself and its other employees were not involved in MacDonald's activities. IOS followed this statement with public and private posturing in an attempt to defend its "good name" and reputation in the face of the revelations concerning MacDonald's activities. In fact, Defendant Balsiger threatened suits against persons who made any suggestion -- or were perceived by him to have made any suggestion -- that there might be some connection between

MacDonald's activities and IOS or the other Defendants. IOS subsequently distributed several other public statements touting its supposed efforts to fight fraud, cooperation with law enforcement efforts, and commitment to preserve the integrity of the coupon redemption process.

63.     Even more recently, in July 2005, Defendant Steven Furr, on behalf of IOS, drafted a letter to Pathmark, which apparently had raised concerns about IOS's possible involvement in the government's ongoing investigation following the MacDonald indictment and his subsequent entry of a guilty plea. Furr and IOS represented to Pathmark that IOS was not under investigation for fraud and had done nothing wrong, and specifically denied that non-Pathmark coupons could have been co-mingled with coupons from Pathmark and billed out under the Pathmark program.

64.     To further conceal their scheme, IOS, Bruce Furr, Chris Balsiger and others took steps to keep IOS's employees and others with knowledge of the scheme from cooperating with law enforcement officials and to retaliate against those who provided information to federal authorities, including attempting to condition severance benefits for departing employees on the employee's agreement not to speak to law enforcement officials and taking legal action or threatening legal action and/or financial harm to employees who cooperated with law enforcement efforts.

65.     Defendants Currey and Balsiger also developed computer programs to conceal the accounting of various aspects of the scheme, including programs to shift manufacturer chargebacks from non-paying small retailers to stores that were submitting legitimate coupons to IOS.

66.     On March 6, 2007, a federal grand jury in this District indicted Defendants on multiple counts of wire fraud in connection with the scheme at issue here. Although some of the

Plaintiffs here had been subpoenaed to provide information to the grand jury in the course of its investigation, the indictment was the first time that Defendants' scheme and the resulting injuries were revealed.

**COUNT I: FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §1962 (c) (ALL DEFENDANTS)**

67. Plaintiffs repeat and reallege the allegations in Paragraphs 1 - 66 above as if fully set forth herein.

68. At all times relevant to this Complaint, Defendants each constituted a "person" within the meaning of 18 U.S.C. § 1961(3).

69. At all times relevant to this Complaint, Defendants, together with coupon brokers responsible for procuring illegitimate coupons and/or soliciting small retailers to become IOS clients for purposes of submitting illegitimate coupons, and other persons responsible for obtaining and mass cutting coupons to be used in the scheme, and others not named as defendants herein, constituted an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

70. Defendants have conducted or participated, directly or indirectly, in the conduct of the affairs of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), including the aforementioned acts of mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343, and additional acts of mail and wire fraud that have yet to be identified and determined.

71. Plaintiffs have been injured in their business or property in an amount in excess of $150,000,000 by reason of Defendants' violation of 18 U.S.C. § 1962(c).

## COUNT II: FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §1962(d) (ALL DEFENDANTS)

72. Plaintiffs repeat and reallege the allegations in Paragraphs 1 - 71 above.

73. Defendants, each being a person associated with the enterprise alleged in this Complaint, unlawfully and willfully combined, conspired and agreed to violate 18 U.S.C. § 1962 (c), that is, to conduct and participate, directly or indirectly, in the conduct of the affairs of an enterprise through a pattern of racketeering activity, all in violation of 18 U.S.C. § 1962(c).

74. Part of the conspiracy was that Defendants each committed and agreed to commit two or more fraudulent and illegal racketeering acts, including mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343, as described above, and conducted and agreed to conduct the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

75. In furtherance of the conspiracy and to effect the objects thereof, Defendants each committed and caused to be committed a series of overt acts, as described above.

76. Plaintiffs have been injured in their business or property in an amount in excess of $150,000,000 by reason of Defendants' violation of 18 U.S.C. § 1962(d).

## COUNT III: COMMON LAW FRAUD (DEFENDANTS IOS AND BALSIGER)

77. Plaintiffs repeat and reallege the allegations in Paragraphs 1 - 76 above.

78. Defendants IOS and Balsiger knowingly misrepresented material facts with the intention of causing actual and justifiable reliance and did cause such reliance by Plaintiffs, to their detriment.

79. Defendants IOS and Balsiger also failed to disclose material facts associated with their submission of coupons for reimbursement and invoices for amounts owed by Plaintiffs in

connection with coupon submissions as such facts were known, should have been known, or became known to IOS and Balsiger, to the detriment of Plaintiffs.

80. As a result of their reliance on Defendants' fraudulent acts and omissions, Plaintiffs have been injured in an amount in excess of $150,000,000.

**COUNT IV: COMMON LAW CONSPIRACY TO DEFRAUD (ALL DEFENDANTS)**

81. Plaintiffs repeat and reallege the allegations in Paragraphs 1 - 80 above.

82. Defendants conspired to develop a scheme to knowingly misrepresent and/or to knowingly omit material facts with the intention of causing actual and justifiable reliance and did cause such reliance by Plaintiffs.

83. As a result of Defendants' fraudulent conspiracy, Plaintiffs have been injured in an amount in excess of $150,000,000.

**COUNT V: COMMON LAW UNJUST ENRICHMENT (ALL DEFENDANTS)**

84. Plaintiffs repeat and reallege the allegations in Paragraphs 1 - 83 above.

85. Defendants knowingly submitted coupons to Plaintiffs that had not been redeemed by any consumer in connection with any retail purchase and/or had not been submitted to IOS by the specified retailer.

86. As a consequence, Plaintiffs made payments to which Defendants were not legitimately entitled. Defendants have been unjustly enriched in the amount of such payments.

87. Plaintiffs are entitled to restitution for this unjust enrichment in an amount in excess of $150,000,000.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request entry of judgment:

1. Awarding Plaintiffs their full monetary damages in excess of $150,000,000, to be proven at trial;

2. Awarding Plaintiffs treble their monetary damages, pursuant to 18 U.S.C. § 1964(c);

3. Awarding Plaintiffs pre- and post-judgment interest on their damages;

4. Awarding Plaintiffs the costs of this action and reasonable attorneys' fees;

5. Awarding Plaintiffs the amount by which Defendants have been unjustly enriched;

6. Awarding Plaintiffs punitive damages in an amount to be determined; and

7. Awarding Plaintiffs such other and further relief as the Court deems just and proper.

Dated this 4th day of October, 2007.

Beth J. Kushner, SBN 1008591
*Attorneys for Plaintiffs*
von BRIESEN & ROPER, s.c.
411 East Wisconsin Avenue, Suite 700
Milwaukee, WI 53202
Phone: (414) 287-1373
Fax: (414) 276-6281
E-mail: bkushner@vonbriesen.com

OF COUNSEL:

Thomas W. Queen
Michael L. Sturm
Benjamin B. Reed
Kirstin E. Michener
WILEY REIN LLP
1776 K Street, NW
Washington, DC 20006
Phone: (202) 719-7000
Fax: (202) 719-7049